Good morning. May it please the Court, this is Kelly Cruz on behalf of the Petitioner, Dr. Nagar Hasami. The Administrative Judge erred in his application of the law under Dr. Hasami's case in finding that she failed to raise a non-frivolous allegation protected under the WPEA. The Administrative Judge relied upon the agency's factual assertions while simultaneously ruling that Dr. Hasami's facts were otherwise inadequate to support a prima facie case under the WPEA. The Administrative Judge should have applied a standard analogous to that of the summary judgment standard under which it would have been clear that Dr. Hasami had demonstrated the existence of disputes of material fact. Thus, the Court should find that the Administrative Judge's decision was arbitrary and capricious, unsupported by substantial evidence, and thus should be reversed. You're talking about the decision of no jurisdiction, is that right? That's correct. As being arbitrary and capricious? Correct and unsupported by substantial evidence. Okay. This is Judge Raynham. Is it your view, Counselor, that we should look at whether or not a frivolous allegation has been made or a non-frivolous allegation and look at that from the standard of summary judgment? Did I hear you correctly? That's correct, Your Honor. This Court found in the case of Khan v. Department of Justice that the standard for determining whether a non-frivolous allegation exists as required to establish MSPB jurisdiction over an IRA appeal is analogous to that for the summary judgment standard. Thus, Dr. Hasami must demonstrate the existence of a genuine issue of material fact. There is a distinction between the requirements for fail on the merits of a WPEA claim and the requirements for jurisdiction. To succeed on the merit, the employee must establish that the protected disclosure was a contributing factor in the adverse action. But the bar for establishing jurisdiction is significantly lower. The employee must merely establish a non-frivolous allegation that should get a protected disclosure. And the administrative judge here has placed the burden on Dr. Hasami to prove in her jurisdictional brief that her disclosures were correct rather than holding her to the standard of a good faith reasonable belief. Ms. Cruz, this is Jodi Stoll. I have some questions for you. What do you think is your best record evidence to support Ms. Hasami's claim that she made disclosures evidencing a substantial and specific danger to public health and safety? I've read Dr. Hasami's affidavit. I'm wondering what else you have. Specifically, I want you to focus on all the statute requires is evidence that her disclosures evidenced a substantial and specific danger to public health and safety. I think you've got two varieties of answers here. One is to the effect of there might not have been enough funds to support future patients. And the second one is perhaps having prolonged treatment would create some sort of medical conditions for veterans who are being treated. But I don't feel like I know the specifics of these issues based on the record. And I also am not sure if it's substantial danger to public health and safety. And that's what I'd like to see you address. Thank you, Your Honor. Dr. Hasami disclosed on at least 17 occasions that Dr. Nichols was prescribing older, more expensive drugs, semperavir and sofravir. These drugs must be taken for a longer period of time, weeks longer. They're also much more expensive. So you are correct in that Dr. Hasami was raising two different concerns. One was that the older drugs had a higher incidence of adverse side effects. Where do I see that in the record? Where is there something in the record that says that the older drug had a higher incidence of, I guess, adverse reactions? That is in the record pages 989 through 994, paragraphs 20 through 21, 28 through 29 and 38, Your Honor. Okay, thank you. And Dr. Hasami had knowledge of that because she is a doctor of pharmacy. And that is why the facility made the decision that they were going to start using the newer drugs, Yakira and Havarni, which can be given for a much shorter period of time, fewer side effects and significantly less expensive, thus not depleting the funds. The agency argues that Dr. Nichols continued to treat people after a moratorium was put in place, and thus they did not experience harm. But actually, this also goes to show that Dr. Hasami had a good faith, reasonable belief to disclose her concerns about Dr. Nichols' prescribing practices. He continued to prescribe after the moratorium was put in place and with the older drugs that had to be taken for a longer period of time and with more side effects. Her concern was immediate and it was great. Excuse me, this is Judge Stoll again. What side effects? Where are the side effects expressly disclosed? I just don't see it in the places where you've identified for me. I am not sure that Dr. Hasami testified specifically on what the side effects were, only that taking the drugs for weeks longer would expose them to greater side effects and that the newer drugs, Yakira and Havarni, had fewer side effects than the older drugs. Okay, I don't see where it says the other drugs have fewer side effects in her declaration, which I think is where you're pointing me to. And I also don't see where it says what side effects will definitely happen or what they were. But also, is there anything in her declaration or anywhere else in the record that talks about the numbers of patients who would not receive treatment? Yes. Dr. Hasami did disclose that there was going to be a very significant budget shortfall in 2015 because Dr. Nichols started treating four patients at a cost of $280,000. And prior to this, the facility had projected total costs for treating 17 patients to be $290,645, meaning that Dr. Nichols was leaving the facility with $10,645 to treat 13 of the 17 patients. So this is not mere conjecture on Dr. Hasami's part. It's very precise and specific. And she was concerned that a failure to comply with the protocol that they had put in place would drain resources and could result in a denial of care. If the denial of care did not happen, that is excellent news. But all Dr. Hasami needs to show is that she had a good faith, reasonable belief that it could happen. And given those numbers, it is entirely possible that there could have been a denial of care for 13 of the 17 patients. Isn't it what she has to show is that a person, a reasonable person in her shoes, knowing what she knew would have had a reasonable expectation that that's the inquiry, right? We don't actually look at her subjective views. It's an objective standard. Isn't that correct? That is correct, Your Honor. And given those numbers, it would make sense that a reasonable person would understand that there could be very few funds left to treat the remaining patients. The agency argues that because Dr. Hasami is not a medical doctor, that she could not have had a reasonable belief that there was going to be a budget shortfall. But if you do look at the specific situation here, Dr. Hasami was part of the interdisciplinary team, and she helped develop these protocols. So she had a clear understanding of which drugs were less expensive, safer, and could be used for shorter periods of time. Counsel, I understand your opinion on that. Oh, I wanted to ask you one other question, which is, what about the email that Dr. Hasami herself sent to the effect of, you know, VISN, I think it's called, has indicated that no patients will be left untreated. What about that email? I believe, if I recall correctly, it's at page A108 of the record. Your Honor, Dr. Hasami was bravely concerned about this situation and was doing some research to determine whether or not they were going to have to turn patients away. But during the course of these disclosures that she was making over time, she was disclosing that it is a possibility that we're going to have to turn patients away. We have very few funds left, and beyond that, these older drugs are not as safe, and we should not be using them, and this is a policy that the facility has put in place. What about this email? Again, it's at page A108, and she says, Mr. Cook assured me that we are going to have sufficient funding to support these patients' treatment terms. He specifically said we will not turn down any patients because of funding. He even said you can quote me about the funding. That seems to belie what you're saying right now. How do you respond to that? Your Honor, at a certain point, Dr. Hasami did learn that the patients would not be turned away. Before sending that email, she was unsure. That's why she was making her disclosures, and that's why she was researching and keeping in mind that a whistleblower need not be correct. They need only have a good faith, reasonable belief that the harm is about to occur, and she did at the time that she was researching to determine whether or not they were going to have to turn these patients away. I understand, but this is information that you have to take into account when you're saying, would a reasonable person, knowing what Dr. Hasami knows,  This email, I guess I'm still not sure how you're responding to it, except maybe that this was just your view at one point in time. That's correct, Your Honor. She was researching the situation. She was disclosing that patients were going to have to be turned away before. She conducted the research. At a certain point, she was told by a member of the facility's administration that they would not be turned away, but it does not mean that she did not engage in protected conduct prior to that. I believe that's my time. Any questions at present for Ms. Cruz? Judge Rainey, you had a question? Yes, I did. Please proceed. It appears to me that what we're talking about here is a legal question, and that's how we're going to look at non-frivolous allegations. What's the level of specificity of the allegation? Counselor, I asked you earlier because of your apparent devotion to the case of Kahn versus the Department of Justice. We said something to the effect that the standard for determining whether a non-frivolous disclosure has been made is analogous to a summary judgment. But we also have a number of other cases that say something a little bit different, like in the school versus marriage systems, Johnson versus Merritt, Eunice versus Department of Veterans Affairs, where we take a different take on this. For example, in school versus Merritt, we say that the proper evaluation of a non-frivolous allegation is under a well-treated complaint rule. In Piccolo versus Merritt, we said that the allegations are sufficient if they're not vague, if they're not conclusory, or facially insufficient. And it seems to me that what we're talking about is does the petitioner here get to the next step of a hearing, of being heard, and the sufficiency of the evidence at that point being enough. I'm concerned about your attachment to the standard that we should apply here is equal to a summary judgment standard. Thank you, Your Honor. In this particular case, the administrative judge asked the parties to brief jurisdiction after discovery had closed, which is why I am saying that this case is more similar to a summary judgment standard in that the parties were not filing their briefs just on what was within the four corners of the complaint, but also including evidence that had been collected during discovery. Your Honor, under the standard that's more similar, I would say, to a motion to dismiss standard, Dr. Hasami has still met her burden in that her initial complaint disclosed violations of law, rule, and regulation, gross waste of funds, gross mismanagement, abuse of authority, and endangered public health and safety. Recognizing that out of those, Dr. Hasami must only really demonstrate that she engaged in protected conduct under one of those standards. And for those reasons, we ask you to reverse the administrative judge's decision and allow her case to proceed to a hearing on the merits. Okay. Thank you. We'll save you a little time, and let's hear from the other side. Mr. Gauger. Thank you, and may it please the Court, Jeffrey Gauger for the Merit Systems Protection Board. It really would not matter what standard the Court applies, whether it's summary judgment, which is in the Court's precedent, in Kahn and other cases, or even if the Court changed the standard to more of a motion to dismiss standard, that would not affect the outcome here, because what the administrative judge found was that these allegations were mere conjecture, and under the MSPB's regulations, the MSPB defines a non-frivolous allegation as something that's more than conclusory. Here, these allegations do not meet any of the categories of disclosures protected under the Whistleblower Protection Act. Mr. Gauger, is it clear that there was, nonetheless, retaliation for the allegations? The administrative judge did not address the retaliation because the first finding that he was required to make to find jurisdiction was that there were disclosures that were protected under the Whistleblower Protection Act, and he found that there were no protected disclosures here, so he did not go on to the retaliation issue. Counsel, does that mean that if we did disagree with the administrative judge, that we still have to remand for the administrative judge then to consider that other factor for jurisdiction? Is that how it works? Yes, that's exactly how it would work. If the court disagreed with the judge about disclosures and found that Fishner had made some protected disclosures, then a remand would be appropriate for the act to address the... But the remand would be for a hearing, correct? That's a little complicated because, at this point, there hasn't been a finding on personal actions, but assuming that there are personal actions here that were taken in retaliation for protected disclosures, then yes, it would definitely go to a hearing to decide the merits. The reason the administrative judge found that these allegations were mere conjecture is that there are really no specifics that support her allegations. For example, she admits that she has no information to support her allegation that patients were put at risk under Dr. Nichols' care. But aren't the facts undisputed in terms of what was prescribed and the compliance, the apparent compliance with the instruction to change the medication? Yes, the facts are undisputed. There are contemporaneous emails that the petitioner does not dispute. I know she did say in her argument, the counsel said in her argument that there were some disputed facts, but she's not identified those facts she means. However, as to... Well, and that the government doesn't dispute. I mean, it's not for her to dispute her allegations. My question really was in terms of the foundational facts that she refers to, whether the government's position is that there was a dispute as to those facts. No, there's no dispute. And we have, you know, if you're talking about the so-called moratorium, there are emails, there are a lot of emails about that subject in the record that are not disputed. At the time that this moratorium was going on, there was only one drug available at the medical center, and that was the S&S, which was prescribed by Dr. Nichols. So he didn't really have a choice if he was going to treat these patients. The only choice at the time was S&S. Or, as petitioners seem to suggest, wait three weeks. I'm sorry. Are you saying that when the VA ordered that a different drug be used, that drug was not available through the VA? Yes. I'm saying that at the time of the petitioner's complaint... I mean, is that in the record? I don't remember seeing that. Yes, it's in the record. As far as the availability of the drug, that's in the record. It became available at the end of a three-week pause on new starts. That's in Dr. Hasami's own email on page 965 of the appendix. She writes, It was decided to hold off on new starts for February only. During that time, they were holding off on new patients, but existing patients would be treated by the drug that they had available, S&S. In the email, Dr. Hasami questions what Dr. Nichols is doing by continuing to treat four patients with the S&S drug. Doesn't her email say Dr. Nichols started four patients on the S&S drug? It doesn't say continued to treat. It says started. Yes. I think later Dr. Bennett looks into it and finds that all but one of the patients that Dr. Nichols was treating had been promised treatment prior to this decision to halt new starts. But even as to that one patient, the reason that these allegations are so vague is Dr. Hasami never explains why this was a bad clinical decision by Dr. Nichols to treat these patients because she never addressed the specifics. Counsel, why does she have to explain why? I mean, under the statute, doesn't it just say, could a reasonable person with her knowledge reasonably believe that this disclosure evidences one of the statutory categories? Why does she have to interconnect the pieces of the puzzle, if you will? Well, of course it depends. To satisfy a category under the WPA, it depends which category we're talking about. What about the category of waste or danger to the public health? Are you saying that it's your position that overprescription of drugs can never be waste or a danger to public health? Well, I don't know that she's alleging that he is endangering the patients by using S&S, which was an approved drug that was already in use. I don't mean the patient. I mean a waste in general or a danger to public health in general. Okay, so those are two different categories. As for a danger, her email doesn't say it's a danger. It says that it's focused on the costs involved, that by waiting three weeks and not giving these patients medication, it will save money. So in the email at page 965, she doesn't identify any dangers. As far as gross waste of funds, yes. Just talking about the cost is not sufficient to satisfy that category. She also has to address the benefit side of the equation, because the question isn't just how much is being spent. That's just a label for the information. But what's important to know is how is that cost significantly out of proportion to the benefits that are reasonably expected. This is Judge Stoll. Let's hypothetically say that Dr. Nichols started four patients on old drugs and actually it was $1 million or $10 million, some amount. Are you saying that she would have to go further and say, and this is a debatable expenditure that is significantly out of proportion to the benefits? Does she have to say those magic words? Again, I'm going back to the statute itself that suggests that a reasonable person in her position, knowing what she knows, has to think that her disclosure evidences a gross waste of funds or evidences a substantial and specific danger to public health. She doesn't have to say it. I would prefer that you sit here and talk to us about why it is that this doesn't evidence these statutory categories. Could you address why the disclosure at page A-965 doesn't evidence one of the statutory categories that she's identified? The only category that email would evidence would be gross waste of funds. It doesn't meet that because she doesn't go on to address basically what Dr. Nichols is doing wrong, other than the fact that this costs money. Dr. Nichols is in the clinic and he's the one making the decisions about how best to treat patients. Throughout this record, there is plenty of times the policy is stated that it's up to the clinician to decide the proper treatment, the medication. It's stated on, for example, page 95, antiviral treatment should be provided for any patient for whom you believe treatment is urgently needed. I think to make an allegation that's specific enough, she would have to address why this treatment isn't needed and why it's proper to wait another three weeks to treat these patients. That's something that's never raised. Simply say how much something costs is not sufficient. The numbers here in terms of cost are- Can I interrupt you again? What about my hypothetical I asked you? I know I asked you a multifaceted question, but I asked you a hypothetical of, let's say hypothetically that Dr. Nichols started four patients, he charged a million dollars, even though the cost of the drugs is $208,000. Would she have actually needed to say more than that? Yes, she needs to address- there needs to be some context. She needs to address the benefit side of the equation. The numbers here are already extraordinary. A million dollars, well, Congress appropriated billions of dollars for this project with the goal not just to give you- My hypothetical, maybe you missed my hypothetical. Oh, Catherine was about if it was- My hypothetical was assuming that the drugs really only cost $208,000, but somehow he got it on, paid a million, I mean $100 million or something like this. Wouldn't that alone be enough to evidence gross waste of funds? If I understand the question, it's if the drugs he were using were just disproportionately more expensive than the drugs- No, no. My hypothetical is what if he was somehow- Again, it's just a hypothetical, but if he somehow had charged the government $100 million, the VA $100 million for drugs that only cost $208,000. Yes, that sounds like that would be wrongdoing. She wouldn't have to explain it, right? If she said that he was spending that much money on drugs, of course, in this situation, the drugs were being dispensed by the pharmacy and they were obtained from the VA through the VA's contracts with the pharmaceutical company. The prices were set. But if somehow he was able to charge money for the drugs, that would be wrongdoing. That's not really- I would say that's not really analogous to what's happening here where- I understand. I just was trying to get at the point that she doesn't have to explain it if a reasonable person in her shoes, knowing what she knows, would know what her disclosure evidenced. Correct? That it evidenced a gross waste of funds. Yeah, under those circumstances, yes. But to simply say that, well, if you wait three weeks, we can save some money, the problem with that is that it doesn't address the actual patients involved, the specific needs of the patients. And the purpose here is not just to give the patients medicine, it's to actually cure the patients. So in some cases, Dr. Nichols extended therapy beyond the initial course of treatment, and Dr. Sami objected to that. But the question here is not harm done to the specific individual. It deals with the overspending. And from the record, what I saw is that she did tell quite a few people about the overspending of the hepatitis funds. She told Dr. Seale, members at the center, Dr. Freer, Dr. Bennett, the chief financial officer, Mr. Shulmaker, the associate director. She went around and told all of them that there was overspending going on, and why is that sufficient, a sufficient allegation? It seems to me that you're asking her to also prove the adverse or the opposition to her own case. Well, no, the standard is whether the spending was out of proportion to the benefit reasonably expected to be provided. And that's what she has in address. I mean, just saying how much things cost, that's just stating a conclusion. They all knew how much things cost. According to the petitioner, every time a pill was dispensed, they knew that, and they knew how much it cost. So just talking about that alone is just, as the administrative judge said, is just conjecture. Just to finish, she also admits that she had no information that patients were ever denied medicine due to budget issues. So that's a key admission at page 86 of the appendix. Okay. Any more questions for Ms. Shulmaker? Then we'll hear rebuttal from Ms. Cruz. Three minutes. Thank you, Your Honor.  I will note that although the administrative judge did not come to a decision on whether or not there was an adverse action, it is in the record that Dr. Hasami received an improper disciplinary action and an improper reassignment or transfer. That's not something that the administrative judge addressed. Ms. Cruz, this is Judge Shull. I just want to ask you one quick question. What evidence in the record shows that the expenditure was significantly out of proportion to the benefit reasonably expected to accrue to the government? Dr. Hasami, in her emails and in her affidavits, testified on the actual numbers of how significantly more expensive it was to continue to use the older S&S drugs. She expressed concern on how long the patients needed to remain on these drugs, therefore it was a less effective treatment. And also, Your Honor, to go back to a question that you asked before about the point at which Dr. Her protected disclosures take place over a significant period of time. Today we've discussed a lot about what happened during the moratorium in February 2015, but Dr. Hasami started making disclosures about Dr. Nichols' prescribing practices in December 2014 and continued to do so until November 2016, which I think might explain why at a certain point she researched and thought what she hoped to be assurances that no patients were going to be turned away. Okay. Any more questions? Last comment, Ms. Cruz? I don't believe so, Your Honor. If there are no further questions, I proceed the remainder of my time. Okay. Thank you, and thank you both. The case is taken under submission. And that concludes this panel's arguments for this morning. The honorable court is adjourned until tomorrow morning at 10 a.m.